In re PORTAGE WHOLESALE CO.

B. F. GOODRICH CO. et al. v. DEVINE.
Appeal of CONWAY.
Nos. 9881–9882.

United States Court of Appeals,
Seventh Circuit.
July 17, 1950.

Rehearing Denied Sept. 8, 1950.

Maurice M. Loman, Randolph Bohrer, Chicago, Ill., for appellants.

Ross Bennett, Portage, Wis., for appellee.

John T. Harrington, Madison, Wis., for District Judge.

Before KERNER, FINNEGAN, and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This case comes to us as an appeal from an order of the District Court for the Western District of Wisconsin, which affirmed the order of Referee in Bankruptcy, Miles C. Riley, appointing George L. Devine trustee of the estate and effects of Portage Wholesale Company, bankrupt, and also provided that the appellant, Vaughn S. Conway, not be permitted to practice in that court until he had made an apology to the referee and that apology had been accepted.

This appeal questions (1), the validity of the election of Devine as trustee of the bankrupt, and (2), the validity of the order of the District Court prohibiting the appellant, Conway, from practicing in that court until he had apologized to the referee and his apology had been accepted.

On January 7, 1949, at the first meeting of the creditors after the adjudication of bankruptcy, Devine was declared elected trustee of the bankrupt. Conway claims to have cast in excess of 140 votes for one Earl S. Mullen, aggregating claims of $123,000, whereas only 30 votes, aggregating claims of $52,000, were cast for Devine. Of the votes cast by Conway under powers of attorney, all were challenged with the exception of 16 because of insufficiency in form under General Order in Bankruptcy 21 (5), 11 U.S.C.A. following section 53. and all were challenged because of the manner and method of their procurement by Conway. These powers were challenged by John T. Harrington, who had been acting as one of the attorneys for the receiver of the debtor in proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. The powers challenged as to form were executed by corporations or partnerships and did not contain a sworn statement by the person executing such

powers that such person was a member of the partnership or a duly authorized officer of the corporation on whose behalf he acted, as required by General Order 21 (5). In most of these powers of attorney, the jurat did contain a statement of the notary that the one executing the power of attorney. was an officer of the corporation for which the power of attorney was being executed. In In re Saslaw, D.C., 275 F. 587, the court upheld the action of a referee in refusing to permit a person holding such a power of attorney to vote. In discussing the powers of attorney there in question the court said, 275 F. at page .588:

"Those executed by partnerships are proved before an officer qualified by paragraph 5; they contain the allegation that deponent is a member of a partnership, but the officer taking the proof makes no statement over his signature that the deponent was personally known to him, or that his identity was established. Those instruments executed by corporations are proved before a qualified officer, but contain no allegation that the officer executing it is duly authorized to act on behalf of the corporation (in executing the power), and do not contain a statement by the officer taking the proof that the deponent was personally known to him, or that his identity was established.

"The fact that the deponent in the corporation proofs swears that he is the treasurer of the corporation is not sufficient in my opinion; there is no implication that a treasurer is duly authorized to execute powers of attorney. Furthermore, paragraph 5 of General Order XXI expressly requires that the officer swear that he is duly authorized, not that he is merely duly elected, or that he is the treasurer."

■ In our opinion the referee correctly refused to permit Conway to vote under the corporate and partnership powers of attorney which did not comply with General Order 21 (5). While this objection may seem technical, matters of vital importance to the creditors are determined in meetings of creditors where these proxies are to be voted. Matters so determined and acted upon should not be lightly set aside. It is understandable, therefore, why it was thought important to require the sworn statement of the person executing such a proxy that he had been authorized to execute it.

At the time of the election the referee in his order stated: "In my mind the objections to the powers of attorney, is not so much to the form, even though these have real substance, but the more penetrating objection relates to the matter and means of soliciting powers and proxies."

■ This latter objection to Conway's corporate powers of attorney is supported only by appellee's Proposition Three, that powers of attorney are invalid when solicitation thereof is by an attorney for the bankrupt. This Proposition would state a valid objection to these powers of attorney if Conway had been the attorney for the bankrupt. It is true that long before the bankruptcy proceeding was started, Conway had done some legal work for the bankrupt, but throughout the Chapter XI proceedings, which had been in progress approximately two years at the time the election of the trustee was held, the bankrupt had been represented by other attorneys. The record plainly discloses that throughout those proceedings, Conway was a creditor of the bankrupt, represented many other creditors of the bankrupt and had been antagonistic to the bankrupt and to Jake Marachowsky, who owned the controlling interest in the bankrupt corporation and other related corporations.

In the appellee's argument under this Proposition, objection is also made to statements in certain letters which Conway wrote to creditors of the bankrupt soliciting powers of attorney. The trustee points out that the statement of Conway in one of his letters that he was instrumental in the recovery of $25,000, being the deposit of the bankrupt, is "misleading." In these letters Conway did mention the fact that he had made a motion to impound the $25,000 deposit of the bankrupt as shown by the transcript of proceedings before the referee. The fact that Conway did make such a motion is shown by the transcript of the creditors' meeting of August 17, 1948.

In one of Conway's letters he said that he was instrumental in developing an offer of $254,000 for the Portage Wholesale Company assets. The trustee in his brief says that was not true; that no such offer was made; and that the only offers before the Court were the debtor's two offers. We do not have before use a record which shows all that happened before the referee below. We do have the statement of the District Judge in his order of October 29, 1948, in which the Court said that after the amended offer of $150,000 was made, "An increase of $25,000 to that offer was made, after Marachowsky learned that others would pay $210,000 for the assets of the debtor company if it were adjudicated a bankrupt." The judge evidently recognized the effect of such offers on the action of the bankrupt although the trustee in discussing this matter would have us ignore such higher offers because, "Under the provisions of the Bankruptcy Act, Chapter 11, Art. 2, [11 U.S.C.A. § 706 et seq.], all proposals of arrangement must be made by the debtor, and the only offer that the debtor made and the only offer before the Court was the debtor's first offer of $150,000.00, and its second offer of $175,000.00."

The trustee also charges that in one of the letters Conway stated that "Jake Marachowsky gained the confidence of the Referee and that it was impossible to overcome that in spite of all that was happening", and that this statement is not borne out by the record. A careful investigation and consideration of all of the record we have in this case disclosed many matters which transpired in the receivership while it was under the supervision and direction of the referee and which are difficult for us to understand. Many such matters are described in Conway's letters and his statements concerning them are not challenged by the appellee.

In his letter of December 18, Conway stated: "In as much as this proceeding has been quite a mess due to Jake Marachowsky's activities, and what he got away with, the Bankruptcy proceeding is going to be rough. Every attempt will be made to keep the present Receiver and Attorney in, and to do as much as possible to keep the lid from blowing off."

In his letter of December 17, 1948, Conway stated: "The Referee announced at one time that the Receiver had accumulated $42,000 in cash. That is all gone. Jake Marachowsky swindled the Receivers out of $46,000 worth of gas and oil and never paid anything for it. The Attorney for the Receiver did garnishee and tie up about $12,000 for this, but $4,200 of this is to make good the bum checks that Jake gave the Receiver * * *."

And again in the same letter:

"The warehouse stock on hand of $112,-000 when this company first filed (January 21, 1947) has now dwindled to less than $50,000.

"Of course Jake Marachowsky Stores Company account that was about $80,000. when this company went in, is now up to better than $126,000 and has not been paid.

"More than two years have gone by since your account became due. The $40,000 Receiver's fund is gone, $60,000 Warehouse stock is gone, and we have the Referee's estimate of possibly $25,000 administration expenses in this matter.

"Jake Marachowsky had $46,000 worth of gas and oil to sell in his station, and $46,000 worth of stock to sell in his store."

While we do not want to be in a position of appearing to condone or excuse reckless or unwarranted charges by attorneys against courts or against officers of the courts, we do feel that the record submitted to us substantially supports the charges made in Conway's letters against the bankrupt and against Jake Marachowsky. In view of all that had happened in the receivership, it is understandable that neither Conway nor any other informed creditor would want a trustee appointed who might be influenced, directly or indirectly, by either the receiver, Goetz, or by Jake Marachowsky. In our opinion, even though some of the statements in Conway's letters may have been exaggerated, his solicitation of the proxies did not furnish a sufficient reason for depriving the majority of the creditors of their vote for a trustee, but, as stated above, the

objection was valid as to non-compliance with General Order 21 (5).

■ On that part of the District Court's order which prohibited Conway from practicing in that court until he had apologized to the referee and his apology had been accepted, counsel filing a brief here for the District Judge described Conway's conduct as an abuse of his "rights and privileges by his contemptuous and disrespectful utterances concerning the Referee in Bankruptcy." The "utterances" then quoted are found in Conway's letter of December 17, 1948, which he sent to creditors of the bankrupt and are as follows: "In view of the large immense losses we creditors have suffered in this matter by the depletion of the assets, it may become necessary to ask that this matter be referred to another Referee. Early in the game in this proceeding Jake Marachowsky gained the confidence of the Referee and it was impossible to overcome that in spite of all that was happening and, as the Referee told me, 'He knew of things Jake Marachowsky was doing that even I didn't know anything about.' "

The order of the District Judge demanding the apology to the referee and prohibiting further practice by Conway until apology was made and accepted, was entered after a "hearing" on a petition by Conway for review of the order of the referee appointing Devine as trustee for the bankrupt.

Conway's petition for review set out that he was a general creditor of the bankrupt and was the duly authorized agent and attorney for the majority, in number and amount, of the general creditors under the powers of attorney which he held; that at the meeting of the creditors held on January 7, 1948, to elect a trustee of the bankrupt, Mr. Harrington, an attorney for the receiver of the debtor under the Chapter XI proceeding, nominated Devine as trustee while Conway nominated one Earl S. Mullen; that Conway cast the votes he represented for Mullen; that the referee disregarded the votes cast by Conway and entered an order appointing Devine as trustee; that the referee refused to recognize the proxies held

and voted by Conway for the reason that they had been solicited; but that the respondents failed to show that petitioner had solicited the proxies for, or on behalf of, or in collusion with the bankrupt, or for any other purpose detrimental to the interest of the general creditors. This petition for review was filed on January 17, 1949.

On the next day the matter was called for hearing in the District Court. The hearing was a most unusual proceeding. When the Court asked the parties to proceed Mr. Conway addressed the Court and stated that he had not had an opportunity to inspect the return of the referee to the petition, and that he would like an opportunity to do so. The Court then said: "I have inspected the return. I have the file here. And I have this to say to you Mr. Conway:"

The Court then proceeded to deliver a lecture to Conway concluding with the statement: "Your conduct has been such as to reflect on the dignity of the courts and to bring the legal profession into disrepute. It merits disciplinary action. You owe an apology to the Referee and until that apology is made and accepted you will not be permitted to continue to practice as an attorney in this court."

The Court then denied Conway's motion for review; affirmed the order of the referee appointing Devine as trustee; and admonished Conway: "And you had better make your peace with the Referee."

According to the stenographic transcript of this "hearing" no evidence was heard on the petition to review or on any charge against Conway. In fact, no charge was filed against Conway. Conway neither said nor did anything during the "hearing" to justify the action of the Court. We can only conclude that the action of the Court was based on the return of the referee which Conway was not permitted to see, and on the letters which Conway had written to the creditors which were made exhibits to the certificate by the referee to the Judge on Conway's petition for review.

A proper consideration of this action of the Court requires a review of the entire proceeding which culminated in the Court's

action. The bankrupt, Portage Wholesale Company, was engaged in a wholesale business at Portage, Wisconsin. This corporation filed a petition under Chapter XI of the Bankruptcy Act on January 21, 1947. On that date Marachowsky was the principal stockholder of the debtor. The two principal customers of the debtor were Marachowsky Stores Company and A. M. Oil Company. At the time of the reference the Marachowsky Stores Company stock was owned by a brother of Jake Marachowsky, Jule Marachowsky, and members of his family, and the A. M. Oil Company was owned by Jake Marachowsky and his brother, Jake Marachowsky owning the majority of said stock.

January 22, 1947, according to the minute book of the referee, Edgar M. Alstad, an attorney of Madison, was appointed as the receiver of the debtor to operate its business under Chapter XI. This was done on the nomination of Jule Marachowsky. According to the same source the referee held a conference on the same day with the receiver, Alstad, Mr. Goetz, who was then a director and president of the debtor, Jule Marachowsky and Lloyd Chambers, the attorney for the debtor, concerning the conduct of the business by the receiver. At this conference it was decided that the operation of the debtor under the receiver was to be under the supervision and control of the referee and that *all sales* and purchases by the debtor *were to be for cash.*

On February 4, the referee wrote a letter to Alstad, receiver, asking that the referee be given "detailed information with respect to receptions and disbursements of funds" and saying: "You understand, of course, the necessity of the referee's being fully informed with respect to the business up there at all times. * * * I think you will also recall my suggestion that sales by the company be on a cash basis and that no sale out of the usual course of business be made by, or on behalf of the company without my written authority."

On March 31, 1947, at the first meeting of the creditors, the referee explained to the creditors that the business of the debtor was being operated by a receiver appointed by the court and that: " * * * the receiver makes daily reports to the Referee of cash receipts and disbursements; he makes a summary report at the end of each month." He further explained that according to the statement of assets and liabilities of the debtor, the assets exceeded the liabilities, and that so far as he had been able to determine, the statement was honestly made and that he had checked into it as carefully as he could. Again, in the adjourned meeting of the creditors held on April 12, 1947, when the creditors were discussing the appointment of a creditors' committee, Mr. Alstad stated that he made "a daily report to Mr. Riley (Referee) and a monthly consolidation of the business." The referee added, "And in addition to that, we have daily conferences." In this discussion concerning the advisability of the appointment of a creditors' committee to cooperate with the receiver and referee, the referee pointed out that the administration of the business was under the control and supervision of the referee; that the creditors could get any information they desired from the referee; and that a creditors' committee would entail more expense. No creditors' committee was appointed.

In the creditors' meeting of April 26, 1947, the referee promised the creditors that he was "going to endeavor in every way to keep so closely in touch with this situation up there, and the business", that if he found at any time that continued operation of the business was going to result in a loss he would let the creditors know.

The referee's minute book under date of July 25, 1947, shows that there was no order of confirmation of the debtor's first proposed arrangement "because no statutory deposits." On the same date the minute book shows that the debtor filed a petition of a modified or amended plan or arrangement. This plan provided for the payment by the debtor of a total of $150,-000 in full satisfaction of all the claims of the creditors; and, on September 3, an application for an order of confirmation on this amended plan was filed and a deposit of $25,000 was made with the referee.

On September 10, 1947, Alstad resigned as receiver and Robert M. Goetz was appointed on the same day. In the meeting of the creditors on September 13, 1947, called to consider the confirmation of the amended plan the referee stated that Alstad resigned and stated further: "And I have appointed—I, personally, appointed Mr. Goetz in his place; and Mr. Goetz has qualified by filing a $10,000 bond with me. So Robert M. Goetz is now the receiver in this proceeding."

This is the same Mr. Goetz who, at the time the debtor's application was filed on January 21, 1947, was a director and the president of the debtor corporation, and who, on August 17, 1948, in an adjourned meeting on confirmation of the amended plan testified under oath that he believed that as a matter of record he was still an officer and director of the debtor corporation.

In the creditors' meeting of July 22, 1948, there was discussion among the representatives of the creditors as to whether the amended plan, purportedly presented by the debtor was actually a plan authorized by the debtor and after this discussion the trustee said: "We have had a peculiar situation here. Obviously, on the records, the application for permission to submit an amended proposal was made by Mr. Marachowsky, Mr. J. H. Marachowsky. There is no question at all about that." The above statements by the referee would indicate that he was at all times in touch with, and was exercising close supervision of the operation of the business of the debtor. What are some of the facts which such close supervision should have revealed to the referee?

On March 31, 1947, in the first meeting of the creditors to consider the proposed arrangement of the debtor, the testimony of Jake Marachowsky, and the statement of the receiver, Alstad, disclosed the fact that at the time of the incorporation of Portage Wholesale Company, Jake Marachowsky exchanged all of the real estate and equipment belonging to the A. M. Oil Company for capital stock of the Portage Wholesale Company but that he had never transferred the legal title to the real estate to the debtor corporation. In the meeting of the creditors of April 12, 1947, the Receiver, Alstad, reported that on April 5 he had received $9,000 worth of gasoline that went right over to the Mauston station being operated by the A. M. Oil Company, and that Jake Marachowsky could write checks against the account of that company. Alstad said he thought that: "* * * Mr. Marachowsky ought to play ball with us, and see that we get our $9,000 back, or any other money that we advance out of Portage to buy gasoline with." Later in the meeting the referee indicated that this manner had been taken up with him and that he had written to the manager of the Mauston plant saying that there should be no remittance from that plant except to the receiver unless the referee ordered otherwise. The referee then again reminded the creditors that the receiver had only such power under the law as might be given to him by the bankruptcy court and that he, the referee, had entered a formal order authorizing him to conduct the business and stipulating the terms and conditions for such operation, among which terms and conditions was the condition that he must sell for cash. The referee also stated that while the A. M. Oil Company was not a part of the Chapter XI proceeding, he as referee, did have "* * * jurisdiction over the cash that comes into that plant as the result of gasoline furnished to them by the Portage Wholesale Company; and I am going to rule that with an iron hand. So I suggest that you feel perfectly assured of that."

On May 17, 1947, there was filed with the referee a petition requesting an order on Jake Marachowsky to show cause why he should not relinquish and turn over the Mauston station to the receiver herein, and that he be temporarily restrained from interfering with the operation of said business. On May 27, at a hearing on this petition, the referee entered an order that until the further order of the Court all funds and monies received at the Mauston filling station, excepting a daily working balance of $500, shall be paid directly to the Portage Wholesale Company and shall

be accounted for in a separate and distinct book account kept by the Portage Wholesale Company, or in lieu thereof, the Mauston station keep on deposit with the receiver a daily balance of $2,000.

July 24, 1948, the referee's minute book shows that he filed an order to Jake Marachowsky to show cause why he should not be cited for contempt for violation of the order of May 27, 1947. Apparently, no further action was taken on this matter. On July 22, 1948, the receiver's attorney announced to a meeting of the creditors that according to the record of Receiver Goetz, the A. M. Oil Company as of June 30 owed the Portage Wholesale Company the sum of $35,950.73; that during the month of June, Jake Marachowsky had given the receiver checks for $2,500 and $1,687.68, respectively, for gasoline, which were returned because of insufficient funds and were still unpaid; that on the order of the referee the receiver had brought proceedings to try to recoup part of the money; and that in a garnishment proceeding the attorney thought that they had "caught between $8,000 and $10,000." As compared to this debt of almost $36,000, it must be borne in mind that on January 21, 1947, according to the debtor's books, it owed the A. M. Oil Company $8,000. In other words, during the receivership of the Portage Wholesale Company, one or both of the receivers had extended credit, contrary to the order of the referee, to the A. M. Oil Company in a very substantial amount. On June 30, 1948, the debtor was in a worse condition on the A. M. Oil Company account than it had been on January 21, 1947, in the total amount of approximately $44,000.

Not until August 16, 1948, was an order entered by the referee declaring that the real estate and equipment of the A. M. Oil Company belonged to the Portage Wholesale Company.

We find an equally serious violation by the receiver of the referee's orders in the fact that while the Marachowsky Stores on January 21, 1947, owed the Portage Wholesale Company only $80,000, the amount of that debt on July 22, 1948, had increased to $126,000. At the July 22, 1948, meeting of the creditors, Goetz, Receiver, reported that since January 22, 1948, approximately $80,000 had gone into accounts receivable which were owed by the Marachowsky Stores Company and the A. M. Oil Company, the stock of both of which at that time belonged to Jake Marachowsky.

During the two years this bankrupt was in receivership, its merchandise inventory was constantly decreasing. The inventory filed by the debtor as of January 24, 1947, showed merchandise of the total value of $110,439.63. According to an income tax report filed by the receiver this merchandise inventory had shrunk on May 31, 1947, to $99,485.60, and on May 31, 1948, to $75,277.76. On March 8, 1949, the trustee, Devine, reported to the court that he had received a cash offer of about $13,000 for the merchandise, which equalled approximately 65% of the appraised valuation.

The same income tax report filed by the receiver on May 31, 1948, showed that the cash fund of $40,000 of the debtor decreased to $36,986.44 by May 31, 1948. In the creditors' meeting of July 22, 1948, the referee reported that the $40,000 with which they had started had shrunk to practically nothing and on the question of what had become of it he said: "So far as I am concerned, the only answer I can give you to that is that that has gone to the chain of Stores (Marachowsky Stores Company.) and to the A. M. Oil Company by way of credit—that should not have been extended to them, or to either of them."

It seems clear to us from the partial record which we have of this entire proceeding that the debtor, during the Chapter XI proceedings, was at no time sincere in its offer and at no time was treating the referee or the court fairly. The first arrangement proposed by the debtor was that it be granted a two year period within which it would pay off all of its creditors in full. While this proposal was pending the receiver on February 8, 1947, petitioned for and was granted a temporary restraining order restraining Jake Marachowsky from entering upon the premises of the bankrupt and an order for him to show cause why

he should not be punished for contempt for an incident in connection with a sale of the debtor. His order was dismissed on February 27, 1947, upon the recommendation of the receiver and the report that "Jake has been O. K." On May 17, 1947, there was an order for Jake Marachowsky to show cause why he should not relinquish and turn over the Mauston station to the receiver and be restrained from interfering with the operation of said business. This order was not actually heard and finally determined until August 16, 1948, more than a year later.

After much delay and many meetings of the creditors and persons interested, the referee on July 25, 1947, made the following entry as to the debtor's first proposed arrangement: "No order of confirmation because no statutory deposits." On the same day a petition was filed asking consideration of a modified or amended plan or arrangement which, as we have pointed out above, was thereafter declared by the referee to be the offer of Jake Marachowsky. This offer was to pay the creditors $150,000 for a full release of all of their claims. Meetings of the creditors on this second proposal were held on July 22, 1948, and on August 17, 1948. In both of these meetings heated discussions were had between the parties and their attorneys as to the condition of the debtor at that time and as to who had been at fault in bringing about that condition. In the meeting of August 17, the attorney for the debtor accused the receiver, Goetz, of accepting checks from Jake Marachowsky for merchandise when he, the receiver, knew that there wasn't any money in the A. M. Oil Company account. Mr. Goetz, the receiver, denied this and the attorney for the debtor then said: "And I resent those remarks, your Honor, made by Mr. Goetz, a self confessed ex-convict."

In this same meeting Mr. Conway and Mr. Skolnik, representing other creditors, both insisted that they be given an opportunity in that meeting to offer proof on why the second plan should not be accepted and why they should be permitted to withdraw their votes which they had cast earlier in favor of acceptance. The referee refused to permit the introduction of such evidence and assured them that, "I'm not going to confirm without giving you a chance to come in here with proof, so that you can change your vote."

While consideration of this second plan was pending the referee entered another order on July 24, 1948, on Jake Marachowsky to show cause why he should not be cited for contempt for violation of the referee's order of May 27, 1947. During this same time, claimant Belle Blitz, whose husband had sued Jake Marachowsky for alienation of affection, amended her claim against the debtor (which had originally been filed for $36,000) to $126,000. The hearing held on this claim convinced the referee, according to his subsequent findings, that the majority of the items of the claim were fraudulent and were founded on checks and invoices which were in the handwriting of Jake Marachowsky, none of which was entered on the books of the Portage Wholesale Company.

During this same period Conway delivered to the referee a petition which he executed on July 20, 1948, in which he pointed out to the referee the various transactions of Jake Marachowsky, including the fraudulent claim of Belle Blitz, and the disastrous effect these various transactions had had on the financial condition of the debtor. The petitioner asked that the referee issue an order requiring Marachowsky and Goetz to show cause why, (a) the Portage Wholesale Company should not be immediately adjudicated bankrupt; (b) why the $25,000 on deposit with the court should not be forthwith impounded for the benefit of the creditors, and (c) why the Portage Wholesale Company should not cease doing business and be immediately liquidated for the benefit of the creditors. A note written by the referee on this petition states: "Left in referee's office at earlier date but withheld from filing—referee felt improper procedure * * * 1949 Filed, January 29, Rec'd."

On September 3, 1949, before there had been any action confirming or rejecting the proposed amended or modified arrange-

ment there was filed with the referee a second proposed modified arrangement, which proposal increased the amount offered to $175,000 in full settlement of all of the claims of the creditors. According to the minute book of the referee this second modified arrangement was confirmed by an order filed by the referee on September 21, 1948. This confirmation was ordered without any further meeting of the creditors and without giving Conway or Skolnik an opportunity, as promised by the referee, to offer proof as to why confirmation should not be ordered. We do not know from the record before us whether this was a proposal by the debtor or whether it was also made by Jake Marachowsky. We do know that three days before the order of confirmation, Jake Marachowsky had not paid the bad checks he had given the receiver. The minute book of the referee shows that on September 18, 1948, an order was filed directing him to pay said checks in the sum of $4,195.84.

Conway filed a petition for review of the order of confirmation so entered by the referee, but the order of confirmation was affirmed by the Court on October 29, 1948. On that date the Court said that it was his impression that the Marachowskys had been directing Mr. Goetz more or less; and that he didn't think either Goetz, or the Marachowskys had been very fair with the referee. The Court continued:

"It is hard for me to approve of the brazen effrontery of Jake Marachowsky in his defiance of the Court proceedings. He seems to think that he can ride rough-shod over all decency in business and other matters and go untouched. I don't like it. That is neither here nor there for the present.

"The offer was made. The creditors accepted it. An increase of $25,000 to that offer was made, after Marachowsky learned that others would pay $210,000 for the assets of the debtor company if it were adjudicated a bankrupt.

"The referee in bankruptcy has had a difficult problem to handle in this proceeding. At every turn there has been interferences and obstructions interposed by the debtor's officers. The Court might very well assume that Jake Marachowsky directed or sponsored the filing of the Belle Blitz claims, that the referee found to be fraudulent. And, while I will not preside in any other proceedings growing out of this case, I don't think that the authorities ought to overlook some of the things that Jake Marachowsky has done. Men have been imprisoned for contemptuous conduct such as has been disclosed in these proceedings."

The court in that hearing ordered that the $175,000 should be deposited by the debtor not later than 10:00 A.M. November 3, 1948, and stated that if that was not done, the court would entertain a motion to have the debtor adjudicated a bankrupt.

As we have said above, we do not condone the writing by attorneys of letters containing reckless and unwarranted attacks on the actions of courts or judicial officers. However, with the background of facts which this record disclosed it is easier to understand why Conway wrote the letters in question. He had attempted to present to the referee and to the court in petitions and in various hearings many charges against Marachowsky and concerning the operation of the receivership. Such presentations were apparently to no avail. The statements of the referee and of the court indicated that both were aware of the fact that Marachowsky had taken advantage of the receivers and had treated both the referee and the creditors unfairly. Yet, nothing was done about it. The Marachowsky proposed arrangement was confirmed by the referee and the referee's action was approved by the court over the objection of Conway.

Finally, because of the failure of Marachowsky or the debtor to pay in the amount offered on the proposal, the debtor was adjudicated a bankrupt.

It is not difficult to understand why Conway, and other creditors who knew the facts, would feel it necessary to have a trustee appointed who would be free of any possible influence from Marachowsky, or from the receiver, Goetz. It is also understandable why Conway, having failed to

secure action from the referee, might have felt that his only recourse was a direct appeal to the creditors containing statements as to the operation of the debtor's business by the receiver, as to the actions of Marachowsky and as to the resulting losses to the creditors.

Apparently Conway's fears that Marachowsky or the receiver might try to exert some influence as to the selection of a trustee, or as to the operation of the bankrupt after the selection of a trustee were not entirely unfounded. The objections to Conway's powers of attorney were made by one of the men who had been acting as attorney for the receiver. The objections were sustained by the referee and the proxies held by Conway were not voted. The record also indicates that another lawyer who served as attorney for the receiver has been and now is acting as the attorney for the trustee.

In view of this record which we have carefully studied and considered, it is our opinion that the action of the District Court in prohibiting Conway from continuing to practice before that court until after he should have apologized to the referee, and such apology had been accepted by the referee, was unwarranted. The court indicated that it had on file and had inspected the referee's return. The court denied Conway the opportunity of seeing the return. There was no formal charge placed against Conway, nor was he given a hearing or an opportunity to defend himself in any manner. While such action by the court and such an order might be justified by contemptuous action by an attorney in open court, we do not think that under the circumstances of this case the action of the court, or the order against Conway was warranted. Compare In re Patterson, 9 Cir., 176 F.2d 966.

That part of the order of the District Court affirming the appointment by the referee of Devine as trustee is affirmed on the assumption that the trustee has taken, or promptly will take, all proper steps to enforce collection from all persons responsible for all losses occasioned during the receivership by violation of orders of the referee as to the operation of the business of the debtor and as to the extension of credit.